IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

AG-MERIWETHER SALEM CORP.,       )
                                 )
           Plaintiff,            )       TC-MD 110388N
                                 )
     v.                          )
                                 )
MARION COUNTY ASSESSOR,          )
                                 )
           Defendant.            )       **DECISION**

Plaintiff appealed the 2010-11 real market value and real market exception value of

property identified as Account R24874 (subject property). A telephone trial was held on

January 19, 2012. Christopher K. Robinson (Robinson), Attorney at Law, appeared on behalf of

Plaintiff. Curt Arthur (Arthur), licensed real estate broker and leasing agent for the subject

property; Cini Apostol (Apostol), property manager for the subject property since 2005; and

Katherine Banz (Banz), certified general real property appraiser, MAI, testified on behalf of

Plaintiff. Scott Norris, Assistant County Counsel, appeared on behalf of Defendant. Tom

Rohlfing (Rohlfing), Senior Commercial Appraiser, testified on behalf of Defendant. Plaintiff's

Exhibits 1 through 11 and 13 through 19 and Defendant's Exhibit A were received without

objection.

## I. STATEMENT OF FACTS

The subject property is a commercial, multi-tenant office building situated on 24.25 acres

in northeast Salem, Oregon.[1] (Def's Ex A at 3.) The subject property improvement is "[a]

single-story office building with associated parking lots and common areas [that is] 241,605 total

---

[1] The subject property land includes 4.10 acres of wetlands. Defendant determined that the wetlands have "[n]o measurable contribution to the subject property" value. (Def's Ex A at 8.)

building square feet" and 233,358 total leasable square feet.[2] (*Id.*; Ptf's Ex 6 at 10.) The property includes "818 parking stalls." (Def's Ex A at 3.) Arthur testified that the subject property has no clear age because it was built in several stages; the original construction in 1959, building B in the 1970s, and building C in the 1980s. He testified that the subject property has been continuously listed for lease by Plaintiff since 2007. (*See* Ptf's Ex 3 (subject property lease listing).) Rohlfing testified that the subject property was remodeled in 2007, including a new HVAC and new daylight windows. (Def's Ex A at 3.) He testified that the subject property is a large, "fairly utilitarian," class B office occupied primarily by the state.

The subject property was previously a single-tenant building owned by State Farm. Arthur testified that, around 2005, it became known that State Farm would be leaving. He testified that Plaintiff purchased the subject property for $11,550,000 in May 2005; Robinson stated that Plaintiff "took it down to the studs." Arthur testified that there were better offers, but each involved a "substantial due diligence period" and Plaintiff offered a "quick close." He testified that there is nothing to suggest that Plaintiff's purchase of the subject property in 2005 was not arm's-length; the buyer and seller were each represented by a brokerage firm.

As of January 1, 2010, the subject property was leased to Wilshire (Merrill Lynch), the Oregon Department of Human Services (DHS), the Oregon Employment Department (Employment Department), the Oregon Department of Justice (DOJ) (two leases), and George Fox University (George Fox). (Ptf's Ex 14-19.) Arthur testified that each of the state leases include a non-appropriations clause by which the state can terminate the lease if it does not receive funding from the legislature; that is "scary" to potential buyers.

/ / /

---

[2] Rohlfing's report states the subject property is 233,778 leasable square feet. (Def's Ex A at 3.) Rohlfing testified that he relied on a listing for the subject property by Sperry Van Ness. (Def's Ex A at 39.)

Apostol, Arthur, and Rohlfing agreed that, as of January 1, 2010, 14.84 percent of the subject property was vacant; that percentage of the subject property was still vacant as of the date of trial. (Ptf's Ex 5 at 8; Ex 6 at 6.) The vacant portion of the subject property is comprised of three spaces: a 5,164 square foot space, an 11,337 square foot space, and an 18,126 square foot space. (*Id.*) Arthur testified that he is surprised that the 5,164 square foot space has not been leased, but he is not surprised that neither the 11,337 nor 18,126 square foot spaces have been leased because they are both interior spaces that lack access to natural light. Arthur testified that the 5,164 square foot space may not have leased because the subject property has come to be viewed as a "government building" and private businesses are less interested.

The 2010-11 roll real market value of the subject property was $34,632,340, with $6,551,050 allocated to the land and $28,081,290 allocated to the improvements. (Ptf's Compl at 2.) The 2010-11 roll exception real market value was $9,825,170. (*Id.*) The 2010-11 maximum assessed value of the subject property is $23,844,810. (*Id.*) The Board of Property Tax Appeals (BOPTA) reduced the 2010-11 real market value of the subject property to $29,808,810, with the entirety of the reduction in the improvements real market value. (*Id.*) BOPTA did not reduce the 2010-11 exception value of the subject property. (*Id.*) At trial, the parties verbally agreed that the 2010-11 land real market value was $5,686,000, as determined by Rohlfing. (*See* Def's Ex A at 1.) Plaintiff requests that the 2010-11 improvements real market value be reduced to $14,918,068, for a total real market value of $20,604,068. (See Ptf's Compl at 1.) Plaintiff requests at trial that the 2010-11 exception value be reduced to $3,519,618. Defendant requests a 2010-11 real market value of $34,800,000, with no change in the 2010-11 exception value of $9,825,170. (See Def's Ex A at 1.)

/ / /

II. ANALYSIS

The issues before the court are the real market value and exception real market value of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citation omitted). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). There are three methods of valuation that are used to determine real market value: (1) the cost

---

[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

approach, (2) the sales comparison approach, and (3) the income approach. *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003); OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property). Defendant determined a value under all three approaches and gave the most weight to the income approach. Defendant gave little weight to the cost and sales comparison approaches. Plaintiff presented evidence pertaining to the income approach.

A.      *Cost Approach*

The cost approach is "particularly useful in valuing new or nearly new improvements[.]" *Magno v. Dept. of Rev.* 19 OTR 51, 55 (2006) (citation omitted). Plaintiff did not present any evidence under the cost approach. Rohlfing testified that it was difficult to apply the cost approach because the subject property is not new and because it was built in stages at different times. He testified that he used the Marshall and Swift Valuation Services cost estimator to select a replacement cost new of $122 per square foot for a replacement cost new of $29,475,810. (Def's Ex A at 10.) Rohlfing testified that he estimated depreciation at 20 percent for a depreciated replacement cost of $23,581,000 (rounded) for the improvements and a total real market value of $29,267,000. (*Id.*) The court accepts Defendant's conclusion of $29,267,000 as reasonable, noting that Defendant determined that little weight should be given to the cost approach.

B.      *Sales comparison approach*

> "In utilizing the sales comparison approach only actual market transactions of
> property comparable to the subject, or adjusted to be comparable, will be used.
> All transactions utilized in the sales comparison approach must be verified to
> ensure they reflect arms-length market transactions."

OAR 150-308.205-(A)(2)(c). "The court looks for arm's length sale transactions of property

/ / /

similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson*, 2003 WL 21263620 at *3.

Plaintiff did not present any evidence under the sales comparison approach. Rohlfing testified that he looked outside of the Salem/Keizer area and did not find any good comparable sales in terms of size, age, or accessibility. He identified five comparable sales in Salem, based on which he determined a price of $145 per square foot or $33,897,810. (Def's Ex A at 11.) With the exception of sale 3, Rohlfing's comparable sales range in size from 13,977 square feet to 35,075 square feet, with prices per square foot ranging from $117 to $181. (*Id.* at 12.) Sale 3 is a 5,916 square foot medical office that was built in 2009 and sold at $473 per square foot on October 18, 2011. (*Id.*) Rohlfing stated in his report that sale 3 "probably should be disregarded due to being the smallest and of far higher quality." (*Id.* at 11.) Rohlfing subtracted "the estimated cost of $60 per square foot to bring the remaining 38,557 square feet up to the overall standard of the property, or $2,313,420," for an indicated value of $31,584,000 (rounded). (*Id.* at 12.)

Plaintiff did not offer any evidence of real market value under the sales comparison approach. Rohlfing testified that he could not find many comparable properties that sold near the January 1, 2010, assessment date. Rohlfing's sales are all considerably smaller than the subject property and it does not appear that he made an adjustment for the differences in size, or other differences. For that reason, the court finds that Rohlfing's conclusion of $31,584,000 under the sales comparison approach is likely somewhat overstated and given less weight.

C.    *Income Approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17

OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income * * *." *Id.* "[Net operating income] is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254 (citation omitted). "[T]he income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor* (*Confehr*), TC-MD No 110621D at 14 (Feb 27, 2012) (quoting *Bauman et al v. Dept. of Rev.*, 6 OTR 426, 433 (1976)).

1. *Subject property leases*

Arthur testified that Plaintiff looks for leases at $13 to $15 per square foot, annually. He testified concerning each of Plaintiff's leases and identified the rent Plaintiff received as of January 1, 2010. Arthur determined annual lease rates for each of the subject property leases based on net rent and net rentable square feet, not including tenant improvements. Arthur testified that a "very healthy budget" for tenant improvements is $30 to $40 per square foot, but Plaintiff paid close to $60 per square foot for tenant improvements for the state lessees. He testified that the tenant improvements were "amortized" into the leases.

Rohlfing testified that he considered both the actual rents for the subject property and market rents. (*See* Def's Ex A at 14-16.) It appears that Rohlfing calculated annual rent per square foot for each lease based on "useable" square feet rather than rentable square feet. (*Id.* at 15.) As a result, Rohlfing's lease rate calculations are overall higher than Arthur's: $14.79 for the DHS lease, $15.79 for the first DOJ lease; $15.07 for the second DOJ lease; $15.37 for the

Employment Department lease; and $17.61 for the George Fox lease. (*Id.*) In his income analysis, although labeling his data "useable square feet," Rohlfing actually used "rentable square feet" to determine potential gross income. (*Id.* at 18.) The court finds that the actual rents to be considered are those based on the subject property rentable square feet, as determined by Arthur.

Arthur testified that the subject property is marketed on a "full service" or "gross" lease basis. Rohlfing testified that he determined all of the subject property leases to be triple net. He testified that the tenants are billed back for the operating expenses on all of the state leases; thus, they are triple net leases. Rohlfing testified that is very typical for the Salem, government office market. The Employment Department lease states that the lessee is required to pay its portion of property taxes and operating expenses. (Ptf's Ex 15 at 11-12.) The DOJ leases are materially the same as the Employment Department lease with respect to expenses. (Ptf's Ex 16 at 2, 9; Ptf's Ex 17 at 2, 8-9.) The DHS lease states: "Lessor shall bill Lessee monthly for its pro rata share of Operating Expenses, as provided herein under Paragraph 11." (Ptf's Ex 18 at 2, 11.)

It appears that the "base rent" paid by each of the state tenants includes pro rata operating expenses, whereas the "net rent" does not include operating expenses. (*See, e.g.,* Ptf's Ex 15 at 2.) Thus, the "base rents" are reflective of full-service lease rates.[4] However, both Arthur and Rohlfing determined lease rates based on "net rent" which, as stated by Rohlfing, does not include expenses and is reflective of triple net lease rates.

The Merrill Lynch lease is a 10 year lease of 25,683 rentable square feet.[5] (Ptf's Ex 14 at 2-3.) Arthur testified that the lease rate was $12.80 per square foot, annually, for the initial year.

---

[4] The Commercial Rent Roll prepared by Apostol for December 2009 states annual rent per square foot based on "base rent" as follows: $18.29 for the DHS lease; $19.20 for the Employment Department lease; $19.80 for the first DOJ lease; and $18.60 for the second DOJ lease. (Ptf's Ex 5 at 9-10.)

[5] The Commercial Rent Roll prepared by Apostol states 25,936 square feet. (Ptfs' Ex 5 at 9.)

The Commercial Rent Roll prepared by Apostol for December 2008 and December 2009 state annual rent of $6.00 per square foot for the Merrill Lynch lease.[6] (Ptf's Ex 4 at 12; Ptf's Ex 5 at 9.) Arthur testified that the Merrill Lynch lease included only basic tenant improvements because it wanted the lowest lease rate possible; Merrill Lynch completed all of its own build out. Rohlfing testified that the Merrill Lynch lease is not reflective of market rents for "built out" spaces.

Plaintiff's lease with the Employment Department is 16,500 rentable square feet for a period of 10 years beginning on February 1, 2008. (Ptf's Ex 15 at 1.) Arthur testified that, as of January 1, 2010, the net market rent was $13.37 per square foot annually. (*Cf. id.* at 1-2.) Plaintiff's first lease to the DOJ is 19,802 rentable square feet, for a period of 10 years beginning on April 1, 2009. (Ptf's Ex 17 at 1.) Arthur testified that, as of January 1, 2010, the net market rent was $13.10 per square foot annually. (*Cf. id.* at 1-2.) Plaintiff's second lease to the DOJ is 48,412 rentable square feet and for a period of 10 years beginning on July 1, 2008. (Ptf's Ex 16 at 1.) Arthur testified that, as of January 1, 2010, the net market rent was $13.73 per square foot annually. (*Cf. id.* at 1.) Plaintiff's lease with the DHS is 77,718 rentable square feet for a period of 10 years beginning on July 1, 2009. (Ptf's Ex 18 at 1.) Arthur testified that, as of January 1, 2010, the net market rent was $12.86 per square foot annually. (*Cf. id.* at 1-2.)

Plaintiff's lease with George Fox is 7,123 rentable square feet, for a period of 87.5 months beginning on October 15, 2007. (Ptf's Ex 19 at 1-2.) Arthur testified that the George Fox lease was negotiated in 2006 and signed July 24, 2007. Arthur testified that the George Fox

/ / /

---

[6] The commercial rent rolls for December 2010, and December 2011, do not appear to include rent information for the Merrill Lynch lease. (*See* Ptf's Ex 6 at 8-10; Ptf's Ex 7 at 1-3.)

initial year rent is $21 to $22 per square foot annually.[7] (*See id.*) He testified that Plaintiff spent $73 per square foot on tenant improvements for the George Fox lease. Arthur testified that George Fox needed classroom spaces, so additional tenant improvements were required for fire code compliance and sound-proofing. He testified that, excluding tenant improvements, the George Fox lease rate is about $11 per square foot, annually.[8] Rohlfing testified that he would not give much weight to the George Fox lease because it is Class A office space and George Fox pays for third party management in addition to operating expenses.

2.    *Market lease rates; rent conclusion*

Banz testified that the Powell Valuation survey of "Salem/Keizer Office Rent 2001 – 2011" reports asking rents, not effective rents. (Ptf's Ex 9 at 3.) She testified that asking rents do not reflect tenant improvements and rent concessions, which became more prevalent in 2009 and 2010.[9] Banz testified that the 2010 asking rents for full-service leases[10] in the suburban office submarket were $17.48; overall 2010 asking rent was $18.73. (*Id.*)

Rohlfing testified that he looked at market rents for Salem office properties and identified five lease comparables, all triple net, with rates ranging from $13.08 to $19.56 per square foot. (Def's Ex A at 16.) Lease comparables 1 and 2 are 67,720 square feet and 82,055 square feet, respectively; the three other lease comparables are 6,451 square feet or less. (*Id.*) Rohlfing

---

[7] The Commercial Rent Rolls provided by Apostol state annual rent of $22.14 per square foot in December 2009, and $23.45 per square foot in December 2010. (Ptf's Ex 5 at 9, Ex 6 at 8.)

[8] It is unclear to the court how Arthur determined the annual rate of $11 per square foot after adjusting for tenant improvements; that figure is not supported by the evidence presented. (*Cf.* Ptf's Ex 19 at 2.)

[9] Banz testified that typical concessions include "free rent" or higher levels of tenant improvements; concessions decrease over the life of the lease. (*See also* Ptf's Ex 9 at 3 ("Rent concessions became commonplace during 2010, with landlords offering lower rent in exchange for longer lease terms. This trend has continued through the first two quarters of 2011." ).)

[10] "As in years past, the office space has been adjusted to reflect an annual *full service rent structure*. The tenant's rent is a composite of all expenses related to the operation of the office space." (Ptf's Ex 9 at 1 (emphasis in original).)

testified that lease 1 is a short term (two year) lease and that is why the rent is higher: $19.56 per square foot, annually. (*Id.*) He testified that lease comparable two is the Tyco industrial building that was converted to office space; it is an October 1, 2010, lease to "ODOT" at $13.92 per square foot. (*Id.*) Rohlfing testified that the median lease was $16.80 per square foot and the average lease rate was $16.39 per square foot, based on which he concluded a market rent for the subject property of $16 per square foot.

The court finds that the subject property state leases and Rohlfing's lease comparable 2 are given the most weight in determining market rent for the subject property. Those lease rates range from $12.86 to $13.92 per square foot, triple net. The court finds that market rent as of January 1, 2010, was $13.50 per square foot, triple net.

3.      *Vacancy; effective gross income*

As of January 1, 2010, the subject property was 14.84 percent vacant. (Ptf's Ex 6 at 6.) Arthur testified that all of the subject property leases were negotiated between 2005 and 2007 when market conditions were better; the market has been "severely hampered" since 2008. He testified that market vacancy in the Salem/Keizer area was 8 to 10 percent in 2005 and rose to 17 percent in 2011. Arthur testified that the vacancy rate as of January 2010 was about 15 percent. Banz testified that, according to the Powell Valuation annual Salem/Keizer Office and Retail Survey,[11] the overall office vacancy in the Salem/Keizer market was 21.96 percent as of December 2009 and January 2010.[12] (Ptf's Ex 9 at 2.) She testified that the subject property is a class B property located in the "suburban submarket." (*Id.*) Banz testified that the 2010 vacancy

/ / /

---

[11] Banz testified that the office survey included only larger, leased properties greater than 5,000 square feet in size; no owner-occupied properties participate in the survey.

[12] Banz testified that 2009 data is missing from the report because the market was so bad at that time that several appraisers were laid off and there were not enough staff to complete the survey.

for the suburban submarket was 24.86 percent and the 2010 vacancy for class B offices was 19.29 percent.  (*Id.*)

Rohlfing reported that the Salem office vacancy in December 2009, and January 2010, was 22 percent.  He testified that he selected a vacancy rate of five percent because "[i]n virtually every analysis of office property from investors, appraisers and other real estate professionals submitted to the Assessor's Office, the long-term vacancy and credit loss expectations have been 5 percent."  (Def's Ex A at 14, 18.)  The court concludes a vacancy rate of 15 percent as of January 1, 2010, based on the subject property actual vacancy and the market vacancy rates presented by Banz and Rohlfing.  The court finds that the subject property effective gross income as of January 1, 2010, was $2,677,783.

4.      *Expenses; Net Operating Income*

Rohlfing testified that the bulk of expenses are paid by the tenants, so he determined "[t]otal triple net expense[s of] 6 percent," with four percent for management and two percent for reserves.  (Def's Ex A at 14.)  He testified that Ted Pikes of Pikes Northwest, "one of the most active commercial property management companies in Salem, reported a reasonable management fee would be in the range of 3.5 to 4 percent."  (*Id.*)  "Pikes also cited 2 percent as a reasonable and typical reserves estimate."  (*Id.*)  Plaintiff did not present any reliable evidence of market expenses on a triple net lease.  The court accepts Rohlfing's determination of six percent expenses and finds net operating income of $2,517,116 for the subject property.

5.      *Capitalization rate*

Banz testified that market conditions declined in 2009 and 2010; the demand for office properties decreased and capitalization rates increased.  She testified that she did not appraise the subject property for this appeal, though she worked on an appraisal of the subject property in

2005. Banz testified that she compiled a list of capitalization rates based on sales of "large office properties"; the capitalization rates are not "property specific," but are reflective of "large office properties" in the market. (*See* Ptf's Ex 8.) Banz testified that the capitalization rates ranged from 8.04 percent to 10.32 percent with an average of 8.66 percent. (*Id.* at 2.) Arthur testified that, in 2009 and 2010, a seller was lucky to get a capitalization rate under nine percent.

Rohlfing testified that he considered a range of 8.5 to 9 percent to be reasonable and that he determined a capitalization rate of nine percent for the subject property. He testified that he determined a value of $37,114,000, from which he subtracted $2,313,420 ($60 per square foot) for the vacant space build out costs, for an indicated value of $34,800,000, rounded. (Def's Ex A at 18.) Rohlfing testified that he subtracted $60 per square foot (based on tenant improvements for the state leases) for the part of the subject property that was vacant and not yet built out as of January 1, 2010, because the real market value of the subject property is as "stabilized."

Based on the evidence presented by Banz and Rohlfing, the court agrees with Rohlfing that a capitalization rate of nine percent was reasonable for the subject property as of January 1, 2010. The court finds that the indicated value of the subject property under the income approach was $27,967,955 as of January 1, 2010. Arthur testified that Plaintiff spent around $60 per square foot for tenant improvements on each of the state leases, so the court accepts Rohlfing's deduction of $60 per square foot for the vacant portions of the subject property that were not built out as of January 1, 2010. The subject property included 34,627 vacant square feet as of January 1, 2010, for a deduction of $2,077,620 at $60 per square foot. The court concludes an indicated value under the income approach of $25.9 million, rounded.

/ / /

/ / /

D.      *Real market value conclusion*

Rohlfing gave the most weight to the income approach and determined a reconciled value of $34,800,000 for the subject property as of January 1, 2010. (*Id.* at 19.)  The court agrees with the parties that the income approach should be given the most weight in this analysis and finds that the real market value of the subject property was $25.9 million for the 2010-11 tax year, with $5,686,000 allocated to the land and $20,214,000 allocated to the improvements.

Plaintiff argued during closing argument that the value of two adjacent parcels, identified as Accounts R25953 and R24868, one of which has some parking on it, should be subtracted from the real market value conclusion for the subject property because the two lots contribute to the overall value of the subject property. (*See* Ptf's Ltr, Jan 19, 2012.)  Plaintiff presented no evidence on that issue.  Rohlfing stated that he did not consider the value of the two adjacent lots in reaching his real market value conclusion.  He further stated that the subject property has sufficient parking and it is not clear that the two adjacent lots contribute any value to the subject property.  The court finds no support for Plaintiff's request to subtract the real market values of two adjacent parcels from the real market value concluded for the subject property.

E.      *Exception value*

Plaintiff appeals the 2010-11 exception value of the subject property, requesting that it be reduced in direct proportion to the reduction in the 2010-11 improvements real market value. BOPTA reduced the real market value of the subject property improvements from $28,081,290 to $23,257,760, a reduction of $4,823,530. (Ptf's Ex 11.)  Plaintiff argues that, when BOPTA reduced the improvements real market value, it should have also reduced the 2010-11 exception value and it was error not to do so.  Plaintiff argues that there is a "nexus" between the improvements real market value and the exception value given the method by which Defendant

calculated the 2010-11 exception real market value. Plaintiff argues that any reduction in the improvements real market value must also be applied to the exception value; thus, BOPTA should have reduced the exception value by $4,823,530. Plaintiff requests an improvements real market value of $14,918,068 and a corresponding reduction in exception value to $3,519,618.

In support of its request that any reduction in the subject property 2010-11 improvements real market value yield an equal reduction in 2010-11 exception value, Plaintiff provided evidence of Defendant's calculation of the 2010-11 exception value. (*See* Ptf's Ex 1.) Plaintiff provided a spreadsheet from Defendant's office with a handwritten calculation in the margin:

> "(10-11) $26,989,015
> "(09-10) $17,163,842
> "10-11 EXCEPTION
>    "$9,825,170"

(*Id.* at 1.) Plaintiff argues that an inference can be made that the 2010-11 exception value of the subject property was calculated by subtracting the 2009-10 improvements real market value from the 2010-11 improvements real market value.[13] When questioned, Rohlfing testified that he did not complete that calculation, but agreed that Plaintiff's interpretation is reasonable. Plaintiff disagrees that Defendant followed the correct procedure in determining the 2010-11 exception value, but nevertheless argues that the 2010-11 exception value be reduced consistent with Defendant's incorrect method.

Defendant argues in response that there is no statutory process for apportioning a value decrease between real market value and exception value. Defendant argues that it could be that BOPTA determined that the value of the new property was accurate and the value of the old property was too high. Furthermore, Defendant argues that the issue before the court is the real

---

[13] Defendant's spreadsheets detailing the valuation of the subject property state the improvements real market value under the income approach as $26,989,015 for the 2010-11 tax year and $17,163,842 for the 2009-10 tax year. (Ptf's Ex 1 at 1, 5.)

market value of the subject property, not whether BOPTA "got it right"; the intentions of BOPTA do not matter for the purposes of this appeal. Defendant noted that Plaintiff has the burden of proof.

"New property or new improvements" is defined in part as "changes in the value of property as the result of: (A) New construction, reconstruction, major additions, remodeling, renovation or rehabilitation of property[.]" ORS 308.149(5)(a). "The value of new property or new improvements shall equal the real market value of the new property or new improvements reduced (but not below zero) by the real market value of retirements from the property tax account." ORS 308.153(2)(a). In *Hoxie v. Department of Revenue*, this court stated that, in determining exception value, "the court must exclude increases in [real market value] due to cleaning, maintenance and repairs, or minor construction. Likewise, the court cannot consider increases in [real market value] due to inflation, changes in market demand, or changes in management or use of the property." 15 OTR 322, 326 (2001) (footnote omitted).

Robinson stated that after its purchase of the subject property in 2005, Plaintiff "took it down to the studs" and has subsequently remodeled the subject property and completed extensive tenant improvements. Other than Arthur's testimony that Plaintiff spent about $60 per square foot on tenant improvements for the state leases, the parties provided no evidence concerning the remodel of the subject property or the correct determination of the 2010-11 exception value. Plaintiff asks the court to reduce the 2010-11 exception value in direct proportion to the improvements real market value. Under the applicable statutes and case law, it is unlikely that exception value can be correctly determined by subtracting the current year real market value from the previous year real market value. That method is likely to capture changes in real market value due to "inflation, changes in market demand, or changes in management or

use of the property" or "cleaning, maintenance and repairs, or minor construction," none of which are properly included in exception value. The court agrees with Plaintiff that it is unlikely the 2010-11 improvements real market value of the subject property could be reduced from $28,081,290 to $23,257,760 by BOPTA, and further reduced to $20,214,000 by this court, with no reduction in the 2010-11 exception value. Unfortunately, neither Plaintiff nor Defendant presented any evidence of the 2010-11 exception value of the subject property. The court cannot determine the 2010-11 exception value of the subject property based on a method that the court and the parties agree does not comport with applicable statutes and case law. Plaintiff's appeal of the 2010-11 exception real market value is hereby denied.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the real market value of the subject property was $25.9 million for the 2010-11 tax year, with $5,686,000 allocated to the land and $20,214,000 allocated to the improvements. Having received no reliable evidence concerning the 2010-11 exception real market value, Plaintiff's appeal of the 2010-11 exception real market value is denied. For the court to order a change in real market value to the tax roll, Plaintiff must be aggrieved; the ordered change to the tax roll must result in a property tax reduction. ORS 305.275(1)(a). The court did not receive evidence as to whether a reduction in the real market value to $25.9 million would result in tax savings to Plaintiff. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2010-11 real market value of property identified as Account R24874 was $25.9 million, with $5,686,000 allocated to the land and $20,214,000 allocated to the improvements. The tax roll will be adjusted only if Plaintiff is aggrieved under ORS 305.275.

IT IS FURTHER DECIDED that Plaintiff's appeal of the 2010-11 exception real market value of property identified as Account R24874 is denied.

Dated this ___ day of July 2012.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on July 13, 2012, and filed and entered the same day.*